UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARY HAYWOOD, MARTHA LEWIS, ANNIE STUBENFIELD, A.D. LINDSEY, ESSIE MCALLISTER, and SANDRA WALTON, on behalf of themselves and all others similarly situated, | ) ) ) ) | 15 C 8317 |
| | ) | Judge Gary Feinerman |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| CHICAGO HOUSING AUTHORITY, an Illinois municipal corporation, | ) ) ) | |
| Defendant. | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Mary Haywood, Martha Lewis, Annie Stubenfield, A.D. Lindsey, Essie McAllister, and

Sandra Walton brought this putative class action against the Chicago Housing Authority

("CHA") under 42 U.S.C. § 1983 and Illinois law. The operative complaint alleges that CHA

violated the Brooke Amendment to the United States Housing Act of 1937, 42 U.S.C. § 1401 *et

seq.*, its implementing regulations, and Illinois contract law by charging Plaintiffs monthly rent

above the lawful ceiling and by failing to conduct annual reviews and interim adjustments of

residents' utility allowances. Doc. 18. CHA has moved to dismiss the suit pursuant to Federal

Rules of Civil Procedure 12(b)(1) and 12(b)(6). Doc. 27. The motion is: (1) granted as to all

claims alleging violations of the regulations; (2) granted as to McAllister's and Walton's Brooke

Amendment claims; and (3) denied as to the other four plaintiffs' Brooke Amendment claims

and all six plaintiffs' state law contract claims.

**Background**

In resolving a Rule 12(b)(6) motion or a Rule 12(b)(1) motion asserting a facial challenge to subject matter jurisdiction, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Plaintiffs' brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted); *see also Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). The facts are set forth as favorably to Plaintiffs as those materials allow. *See Pierce v. Zoetis*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth those facts on a motion to dismiss, the court does not vouch for their accuracy. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384 (7th Cir. 2010).

CHA is an Illinois municipal corporation and public housing authority ("PHA") created and existing under the Illinois Housing Authorities Act, 310 ILCS 10/1 *et seq*. Doc. 18 at ¶ 14. CHA operates more than 21,000 public housing units in Chicago that are subsidized by the Department of Housing and Urban Development ("HUD"). *Id*. at ¶ 47. Pursuant to 42 U.S.C. § 1437c, a PHA may enter into an annual contributions contract ("ACC") with HUD. CHA's ACC entitles it to annual contributions from HUD; in return, CHA and its contractors must comply with all applicable statutes and HUD regulations. Doc. 18 at ¶¶ 66-67. Four plaintiffs—Haywood, Lewis, Stubenfield, and Lindsey—are CHA residents. *Id*. at ¶¶ 8-11. The two other plaintiffs—McAllister and Walton—are former CHA residents. *Id*. at ¶¶ 12-13.

Haywood has been a CHA resident for sixteen years.  *Id*. at ¶ 15.  Since 1999, CHA has calculated her monthly rent according to this formula:

> Rent = (adjusted monthly household income * 0.3) – utility allowance – tenant patrol stipend

*Id*. at ¶ 16.  At the time of Haywood's most recent rent determination, her household's adjusted monthly income was $1,160, her utility allowance was (and since 2007 has been) $24, and her "tenant patrol" stipend, for a service she provides to her building, was $100.  *Id*. at ¶¶ 17-18.  Accordingly, her monthly rent is $224.  *Id*. at ¶ 18.  Since 1999, in addition to paying monthly rent to CHA, Haywood has been required to pay a third-party utility provider for her electricity.  *Id*. at ¶ 17; Doc. 18-2 at 5.

Lewis has been a CHA resident for decades.  Doc. 18 at ¶¶ 9, 21.  Since 2008, CHA has calculated her monthly rent according to this formula, which will be called the "Rent Formula":

> Rent = (adjusted monthly household income * 0.3) – utility allowance

*Id*. at ¶ 23.  As Lewis's adjusted monthly household income was $660 at the time of her most recent rent determination, and her utility allowance was (and since 2008 has been) $51, her monthly rent is $147.  *Id*. at ¶¶ 21-22, 24.  Since 2008, in addition to paying monthly rent to CHA, Lewis has been required to pay a third-party utility provider for her electricity and cooking gas expenses.  *Id*. at ¶ 22.

Stubenfield has lived in CHA public housing for decades.  *Id*. at ¶ 26.  Since 2005, CHA has calculated her monthly rent using the Rent Formula.  *Id*. at ¶ 28.  At the time of her most recent rent determination, Stubenfield's adjusted monthly household income was approximately $847, and her utility allowance was (and since 2005 has been) $168, so her monthly rent is $86.  *Id*. at ¶¶ 26-27, 29.  Since 2005, in addition to paying rent to CHA, Stubenfield has been required to pay a third-party utility provider for her electricity.  *Id*. at ¶ 27.

Lindsey has lived in CHA public housing since 2010, during which time he has been required to pay a third-party utility provider for electricity in addition to paying monthly rent to CHA. *Id*. at ¶ 32. Since that date, CHA has calculated his monthly rent using the Rent Formula. *Ibid*. As Lindsey's adjusted monthly household income was $1,349 at the time of his most recent rent determination, and his utility allowance was (and since 2010 has been) $24, his monthly rent is $381. *Id*. at ¶¶ 31-32, 34.

McAllister lived in CHA public housing from 1973 until September 2008, and Walton did so from 1971 until September 2009. *Id*. at ¶¶ 36, 41. Both received a utility allowance and were required to pay their electricity and natural gas expenses to a third-party utility provider in addition to paying monthly rent to CHA. *Id*. at ¶¶ 37, 42. CHA calculated their monthly rent using the Rent Formula. *Id*. at ¶¶ 38, 43. The complaint does not specify either of their adjusted monthly household incomes or utility allowances, but it does allege that both paid CHA and their utility providers more than 30 percent of their respective households' adjusted monthly incomes for rent and the reasonable cost of utilities. *Id*. at ¶¶ 40, 45.

At least biennially, CHA calculates a tenant's rent using the household's adjusted income. *Id*. at ¶ 60. To calculate adjusted household income, CHA obtains the verified annual income of household members and makes deductions pursuant to HUD regulations. *Id*. at ¶ 61; *see* 24 C.F.R. §§ 5.609, 5.611, 960.259(c). Then, under the Rent Formula, CHA calculates monthly rent by subtracting a tenant's utility allowance from 30 percent of the household's adjusted monthly income. Doc. 18 at ¶ 62; Doc. 18-1.

CHA last conducted a utility allowance analysis in 1996. Doc. 18 at ¶¶ 49-50. It revised its utility allowances for electricity and natural gas in 1997, 1998, 2000, 2004, 2005, and 2007. *Id*. at ¶ 50. Since September 2007, electricity and natural gas costs have increased for Plaintiffs

and all putative class members; in several instances, the month-over-month rate increases have exceeded ten percent. *Id*. at ¶ 51. Despite this, CHA has not increased its utility allowances for public housing residents since 2007. *Id*. at ¶ 52.

CHA has a standard lease agreement with terms applicable to all CHA residents. Doc. 18-2. Section 1 of the agreement states that a tenant's "rent amount shall be determined by the CHA in compliance with [HUD] regulations and the CHA approved Rent Policy." Doc. 18 at ¶ 69; Doc. 18-2 at 6. The lease further states that if the resident pays a third-party utility provider for utilities, CHA will provide the resident with a monthly utility allowance, and the resident is responsible for making utility payments directly to the utility provider. Doc. 18 at ¶ 70; Doc. 18-2 at 5. The lease then states that the utility allowance "shall be enough to pay for a reasonable use of utilities by an energy conservative household of modest circumstances consistent with the requirements of a safe, sanitary, and healthy living environment." Doc. 18 at ¶ 70; Doc. 18-2 at 5. Section 2 provides that utility allowances are factored into the resident's rent calculation when the resident pays utilities directly to a third-party utility provider. Doc. 18 at ¶ 71; Doc. 18-2 at 7. Section 11 obligates CHA "[t]o comply with the requirements of … HUD regulations materially affecting health and safety." Doc. 18 at ¶ 73; Doc. 18-2 at 20. At all relevant times, Plaintiffs materially performed their obligations under their CHA leases. Doc. 18 at ¶ 46. Section 17 provides that "[d]isputes arising under" the lease "shall be resolved pursuant to the CHA's Grievance Procedure." Doc. 18-2 at 29 (emphasis omitted).

## Discussion

The operative complaint alleges that CHA charged rent above the ceiling set by the Brooke Amendment, 42 U.S.C. § 1437a(a)(1) (Count I); violated HUD regulations by failing to conduct annual reviews of its utility allowances and failing to provide interim adjustments of

utility allowances when the rates on which they were based increased by more than ten percent month-over-month (Counts II-III); and breached its residential leases with Plaintiffs (Count IV). Doc. 18.  CHA seeks dismissal of all counts.  Doc. 27.

## I.    Brooke Amendment Claim (Count I)

The Brooke Amendment provides that for covered dwelling units, "a family shall pay as rent" no more than "the highest of the following amounts":

(A) 30 per centum of the family's monthly adjusted income;

(B) 10 per centum of the family's monthly income; or

(C) if the family is receiving payments for welfare assistance from a public agency and a part of such payments, adjusted in accordance with the family's actual housing costs, is specifically designated by such agency to meet the family's housing costs, the portion of such payments which is so designated.

42 U.S.C. § 1437a(a)(1).  As HUD clarified in a memorandum filed in this suit, Doc. 53, HUD regulations govern the calculation of "rent" under the Brooke Amendment.  One regulation, 24 C.F.R. § 5.628, defines "total tenant payment" as "the highest of the following amounts":

(1) 30 percent of the family's monthly adjusted income;

(2) 10 percent of the family's monthly income;

(3) If the family is receiving payments for welfare assistance from a public agency and a part of those payments, adjusted in accordance with the family's actual housing costs, is specifically designated by such agency to meet the family's housing costs, the portion of those payments which is so designated; or

(4) The minimum rent, as determined in accordance with § 5.630.

24 C.F.R. § 5.628(a).  Another regulation, 24 C.F.R. § 960.253, provides that a PHA may not charge as rent an amount greater than 30 percent of the family's adjusted monthly income (which is the total tenant payment) *minus* the utility allowance:

The income-based tenant rent must not exceed the total tenant payment (§ 5.628 of this title) for the family minus any applicable utility allowance for

tenant-paid utilities. If the utility allowance exceeds the total tenant payment, the PHA shall pay such excess amount (the utility reimbursement) either to the family or directly to the utility supplier to pay the utility bill on behalf of the family.

…

If the PHA elects to pay the utility supplier, the PHA must notify the family of the amount of utility reimbursement paid to the utility supplier.

24 C.F.R. § 960.253(c)(3)-(4). The utility allowance, which PHAs must establish for all check-metered utilities that they furnish *and* for all utilities purchased directly by residents from third-party utility providers, *see* 24 C.F.R. § 965.502(a), is calculated "to approximate a reasonable consumption of utilities by an energy-conservative household of modest circumstances." 24 C.F.R. § 965.505(a); *see also* 24 C.F.R. § 5.603 (defining "utility allowance").

In short, the rent charged by a PHA may not exceed 30 percent of adjusted monthly income minus the utility allowance. Doc. 53 at 2. CHA in this suit initially appeared to suggest that the maximum rent a PHA could charge was 30 percent of adjusted monthly income term, period, without considering the utility allowance. Doc. 30 at 13, 15; Doc. 42 at 8-9. But in a response brief to HUD's memorandum, CHA stated that it "defers to HUD as to the applicable regulations." Doc. 54 at 2. Because CHA does not argue that HUD regulations impermissibly implement the Brooke Amendment under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), or some other deference regime, any such argument is forfeited, if not waived. *See G&S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss or an argument establishing that dismissal is inappropriate.") (citations omitted); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012) ("[T]he forfeiture doctrine applies not only to a litigant's failure to raise a general argument … but also to a litigant's failure to advance

a specific point in support of a general argument."); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("Longstanding under our case law is the rule that a person waives an argument by failing to make it before the district court. We apply that rule where a party fails to develop arguments related to a discrete issue ….") (citations omitted).

CHA moves to dismiss of Count I on two grounds. First, CHA contends that the complaint itself reveals that the rent it charged Plaintiffs did not exceed the permissible rent ceiling, meaning that Plaintiffs did not suffer the injury-in-fact required for Article III standing. Doc. 30 at 13-15; Doc. 42 at 8-9. Second, CHA contends that the Brooke Amendment does not provide a private cause of action for tenants who purchase utilities from third-party utility providers to claim that a PHA is under-calculating the utility allowance and therefore over-charging for rent. Doc. 30 at 15-19; Doc. 42 at 2, 9-11; Doc. 54 at 3-4. Both arguments fail.

## A. Article III Standing

The Supreme Court recently reiterated the requirements for Article III standing:

> Our cases have established that the irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements.

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citations and internal quotation marks omitted); *see also Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016) ("[Plaintiffs] must demonstrate that they have 'suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision.'") (quoting *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013)). CHA challenges only the first element, injury in fact. "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and

actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (internal

quotation marks omitted). "[A]t the pleading stage, the plaintiff must clearly allege facts

demonstrating each element" of standing. *Id*. at 1547 (alteration and internal quotation marks

omitted).

Count I adequately alleges injury in fact. Plaintiffs claim that CHA charged them rent in

an amount exceeding the lawful ceiling. Doc. 18 at ¶¶ 81-83. To take Lewis as an example, the

complaint alleges that her adjusted monthly household income was $660 and her utility

allowance was $51, yielding under the Rent Formula a maximum monthly rent of $147, which is

what CHA charged her. *Id*. at ¶¶ 21-24. If that were all, Lewis might not have a claim, though

the problem would relate to the merits, not Article III standing. *See Aurora Loan Services, Inc.*

*v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006) ("The point is not that to establish standing a

plaintiff must establish that a right has been infringed; that would conflate the issue of standing

with the merits of the suit. It is that he must have a colorable claim to such a right."). But the

complaint proceeds to allege that "because CHA has failed to adequately review and adjust her

utility allowance, Ms. Lewis has been paying and continues to pay CHA and her utility provider

more than 30% of her household's adjusted monthly income for rent"—in other words, that CHA

charges her rent in an amount that exceeds 30 percent of her adjusted monthly income minus a

*properly computed* utility allowance. Doc. 18 at ¶ 25. Put yet another way, the allegation is that

CHA is harming Lewis, as well as her co-plaintiffs, by unlawfully depressing their respective

utility allowances and thereby charging them too much rent.

This is unmistakably injury in fact, as "economic harm is the prototypical injury-in-fact."

*Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of Milwaukee*, 708 F.3d 921, 927 (7th

Cir. 2013); *see also United States v. Students Challenging Regulatory Agency Procedures*, 412

U.S. 669, 686 (1973) (noting that "those who could show 'economic harm'" have standing);

*Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 642 (2007) (Breyer, J., dissenting)

("In the case of economic or physical harms, of course, the 'injury in fact' question is

straightforward."). The injury, moreover, is undeniably traceable to CHA's alleged

misconduct—unlawfully depressing Plaintiffs' utility allowance—and is likely to be redressed

by a favorable disposition of this case—an order requiring CHA to properly calculate the utility

allowance and therefore Plaintiffs' rent. Accordingly, Plaintiffs have standing to pursue this suit.

### B.      Private Right of Action

CHA next contends that the Brooke Amendment does not create a private right of action

to challenge a PHA's calculation of the utility allowance under circumstances where the tenant

pays a third-party utility provider for utilities. Doc. 30 at 15-19; Doc. 42 at 2, 9-11; Doc. 54 at 3-

4. To evaluate this argument, it is essential to begin with *Wright v. Roanoke Redevelopment and*

*Housing Authority*, 479 U.S. 418 (1987), a case similar in many respects to this one. The

plaintiffs in *Wright*, tenants living in public housing owned and operated by the Roanoke

Housing Authority ("RHA"), sued under § 1983, alleging that RHA overbilled them for their

utilities—unlike CHA, RHA provided and charged for utilities—and thereby violated the Brooke

Amendment's rent ceiling. *Id.* at 419-22. RHA contended that the Brooke Amendment did not

provide a private right of action, and the Supreme Court disagreed, explaining:

> The Brooke Amendment could not be clearer: as further amended in 1981,
> tenants could be charged as rent no more and no less than 30 percent of their
> income. This was a mandatory limitation focusing on the individual family
> and its income. The intent to benefit tenants is undeniable. Nor is there any
> question that HUD interim regulations, in effect when this suit began,
> expressly required that a "reasonable" amount for utilities be included in rent
> that a PHA was allowed to charge, an interpretation to which HUD has
> adhered both before and after the adoption of the Brooke Amendment.
> HUD's view is entitled to deference as a valid interpretation of the statute, and
> Congress in the course of amending that provision has not disagreed with it.

*Id.* at 430.  As Plaintiffs and HUD note, *Wright* was consistent with HUD's longstanding

interpretation of the Brooke Amendment, and specifically with the understanding that a tenant

may be charged as rent only 30 percent of her monthly income *minus* a reasonable utility

allowance—or, if the PHA provided and charged for utilities, that a tenant could be charged not

more than 30 percent of her monthly income for rent *plus* whatever the PHA charged for utilities.

Doc. 38 at 17-20; Doc. 53 at 4-6.  Those two ways of expressing the rent ceiling are

mathematical equivalents: (1) rent paid to the PHA ≤ 30 percent of monthly income minus a

reasonable utility allowance; and (2) rent plus a reasonable utility allowance ≤ 30 percent of

monthly income.

So *Wright* is clear: PHA tenants may sue under § 1983 to enforce the Brooke

Amendment's rent cap.  But *Wright* is nearly thirty years old, and CHA argues both that *Wright*

is distinguishable and that its holding has been undermined by intervening regulatory and

jurisprudential developments.  CHA is wrong on both counts.

First, CHA notes that the petitioners in *Wright* paid their utility bills directly to the PHA

and not to outside utility providers, as in this case.  Doc. 30 at 16.  Given this distinction, CHA

argues that *Wright*'s holding is "limited to 'surcharges' imposed by and payable directly to a

PHA as part of the tenant's monthly rent."  *Ibid.*; Doc. 54 at 3.  But nothing in *Wright* suggests

that its holding is so confined; indeed, other than in briefly describing the facts, *see Wright*, 479

U.S. at 420-21 & 421 n.4, *Wright* does not mention to whom the plaintiffs made utility

payments, much less address the issue in any way that even begins to suggest legal significance.

It therefore does not surprise that courts consistently have ruled that *Wright*'s holding applies

with equal force to residents who pay utility expenses directly to third-party providers.  *See*

*Johnson v. Hous. Auth. of Jefferson Parish*, 442 F.3d 356, 362 (5th Cir. 2006) (holding, in a case

brought by PHA residents who contended that their utility vouchers for payments to third-party providers were insufficient, that "[w]e discern no meaningful difference between the statutory entitlement of the plaintiffs in *Wright* and that of Plaintiffs-Appellants here," given that the "effect of an insufficient utility allowance is the same in either case"); *McDowell v. Phila. Hous. Auth.*, 423 F.3d 233, 236 (3d Cir. 2005) ("Since [HUD] has interpreted 'rent' to include the reasonable cost of utilities, housing authorities must issue rebates to tenants who purchase service directly from a utility company.") (citations omitted); *Estey v. Comm'r, Me. Dep't of Human Servs.*, 21 F.3d 1198, 1200 (1st Cir. 1994) ("To prevent tenants who pay for their own utilities from generally incurring excessive utility costs, HUD … regulations permit rent (capped at 30% of income) to be offset by an allowance for utilities."); *Galindo v. Hous. Auth. of City of L.A.*, 2013 WL 10343215, at *4 (C.D. Cal. July 18, 2013) (noting, in a case involving PHA residents who paid trash collection fees directly to the city rather than to the PHA, that "[f]ederal law provides for reimbursement via a utility allowance of payments by public housing residents who are responsible for paying a utility") (citing 24 C.F.R. § 960.253(c)(3)) (citation omitted); *Armstrong v. Gallia Metro. Hous. Auth.*, 2000 WL 1505949, at *1 (S.D. Ohio Sept. 29, 2000) ("[The PHA] may … charge a maximum rent, including utilities paid by tenants, that does not exceed 30% of the adjusted gross income of the tenant family. [The PHA] must therefore account for the utility costs which tenants pay directly to the utility companies."); *see also Clary v. Mabee*, 709 F.2d 1307, 1308 (9th Cir. 1983) (holding, in a pre-*Wright* case, that the Brooke Amendment requires that "[w]hen tenants pay their own utility bills [to third parties] … their rental obligation to the owner must be adjusted").

It is true, as CHA argues, that none of those decisions are on all fours with this case. Doc. 42 at 7-8. *Johnson*, for example, dealt with the Section 8 program (which provides

vouchers for paying rent to private housing providers) rather than PHA residents, and *McDowell* interpreted a consent decree. *See Johnson*, 442 F.3d at 358; *McDowell*, 423 F.3d at 235. But CHA has not explained why those distinctions make a difference, and they clearly do not. *Johnson* and *McDowell* themselves acknowledged their factual distinctions with *Wright*, but concluded that those distinctions were legally irrelevant. *See Johnson*, 442 F.3d at 361-63 ("The Housing Authority's responsive attempt to distinguish *Wright* is unconvincing. … Indeed, in the [Section 8] voucher program Congress essentially validated *Wright*'s holding. The Supreme Court's holding in *Wright* … applies with equal force to the instant case."); *McDowell*, 423 F.3d at 240 (using PHA regulations and *Wright* as a guide in interpreting a consent decree). The same result obtains here.

CHA cites its own set of cases, Doc. 42 at 5-6, but they do not warrant a different result. Those cases are inapposite because they deal with court costs rather than utility expenses, *see Miles v. Metro Dade Cnty.*, 916 F.2d 1528, 1531-32 (11th Cir. 1990); with late charges and legal fees, *see Hous. Auth. & Urban Redevelopment Agency of City of Atl. City v. Taylor*, 796 A.2d 193, 196 (N.J. 2002); with "excess" (rather than reasonable) utility usage, *see Sager v. Hous. Comm'n of Anne Arundel Cnty.*, 957 F. Supp. 2d 627, 637 (D. Md. 2013); *O'Neill v. Hernandez*, 2009 WL 860647, at *3 (S.D.N.Y. Mar. 31, 2009); *In re Parker*, 269 B.R. 522, 533 (D. Vt. 2001); *Binghamton Hous. Auth. v. Douglas*, 217 A.D.2d 897, 897-99 (N.Y. App. Div. 1995); or with one-time deposits, connection fees, and arrearages, rather than monthly expenses, *see Crochet v. Hous. Auth. of City of Tampa*, 37 F.3d 607, 610, 612-13 (11th Cir. 1994). Those cases do not and could not contravene *Wright*.

CHA retorts that this is no matter, because the Supreme Court itself, in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), provided a means of distinguishing *Wright* from this case.  Doc. 30 at 17; Doc. 54 at 3-4.  *Gonzaga* affirmed but cabined the holding in *Wright*:

> In *Wright* …, we allowed a § 1983 suit by tenants to recover past overcharges under a rent-ceiling provision of the Public Housing Act, on the ground that the provision unambiguously conferred "a mandatory [benefit] focusing on the individual family and its income."  The key to our inquiry was that Congress spoke in terms that "could not be clearer," and conferred entitlements "sufficiently specific and definite to qualify as enforceable rights under *Pennhurst* [*State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981)]."  Also significant was that the federal agency charged with administering the Public Housing Act "ha[d] never provided a procedure by which tenants could complain to it about the alleged failures [of state welfare agencies] to abide by [the Act's rent-ceiling provision]."

536 U.S. at 280 (quoting *Wright*, 479 U.S. at 426, 430, 432) (citations omitted).  CHA argues that: (1) unlike the rent ceiling provision at issue in *Wright*, the Brooke Amendment confers no "specific monetary entitlement" to tenants for utility payments made to third-party utility providers; and (2) even if the Brooke Amendment does confer such a "benefit," it does so only to PHA residents in the *aggregate* and therefore does not support an *individual* private right of action.  Doc. 30 at 17-18 (quoting *Gonzaga*, 536 U.S. at 280, 287).  Those arguments are unpersuasive.  *Gonzaga*, like *Wright* itself, does not say or imply that *Wright*'s holding or continued force rests in any way on whether tenants pay utility expenses to the PHA or to a third-party utility provider.  Nor can the Brooke Amendment be understood to confer an aggregate rather than an individual right.  *See* 42 U.S.C. § 1437a(a)(1) ("a family shall pay as rent …").

Notwithstanding HUD's explanation that a consistent "interpretation has been applied by HUD for at least 40 years," Doc. 53 at 4, CHA further contends that *Wright*'s holding was "based upon a different regulatory regime" than the current one.  Doc. 54 at 3.  A review of the legislative and regulatory history defeats HUD's submission.

HUD's first regulations pegging "rent" to income were issued in 1945 and, much like the Brooke Amendment, included the reasonable cost of utilities paid to a third-party utility provider as a component of "gross rent." Requirements for Urban Low-Rent Housing and Slum Clearance, 10 Fed. Reg. 7,321, 7,330 (June 19, 1945) ("Gross rent includes the dwelling rent charged the tenants plus the additional cost to the tenant (if not included in rent) of heat, light, water, and cooking fuel."). An interim rule issued in 1975 distinguished "contract rent"— defined as "the rent charged a tenant for the use of the dwelling accommodation and equipment …, services, and reasonable amounts of utilities determined in accordance with the PHA's schedule of allowances for utilities supplied by the project"—from "gross rent"—defined as "contract rent plus the PHA's estimate of the cost to the tenant of reasonable quantities of utilities determined in accordance with the PHA's schedule of allowances for such utilities, where such utilities are purchased by the tenant and not included in the contract rent." Minimum and Maximum Rent-Income Ratios, and Minimum Rent Requirements, 40 Fed. Reg. 44,324-44,325 (Sept. 26, 1975). The interim rule further noted that "[r]ent means gross rent." *Id.* at 44,325. HUD's characterization of "rent" and "gross rent" is consistent with this position, Doc. 53 at 2 ("[T]he gross rent is defined to include an allowance for utilities. In other words, rent equals shelter plus utilities."), and CHA has deferred to HUD on the issue, Doc. 54 at 2.

HUD maintained the same understanding through several proposed and final rules occasioned by the Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, 95 Stat. 357, and issued from 1981 through 1984. A May 1982 rule defined "gross rent" to mean the maximum rent allowed by the Brooke Amendment, "the amount payable by an assisted family towards the Contract Rent payable to the PHA plus, where some or all utilities are not included in the Contract Rent, the amount of any utility allowance." Gross Rent – Public Housing

Program, 47 Fed. Reg. 19,120, 19,121 (May 4, 1982).  The May 1982 rule was in effect when the complaint in *Wright* was filed.

The rulemaking process culminated in a final rule that replaced the terms "gross rent" and "contract rent" with "tenant rent" and "total tenant payment," and explicitly stated that it remained HUD's "position that any tenant payment of utilities is a payment toward 'rent.'" Definition of Income, Income Limits, Rent and Reexamination of Family Income for the Public and Indian Housing Programs, 49 Fed. Reg. 21,476, 21,483 (May 21, 1984); Doc. 53 at 5. Although the new terms were not precisely identical to the old ones, "tenant rent," defined as the "amount payable monthly by the Family as rent to the PHA," largely mirrored the definition of "contract rent," and "total tenant payment" mirrored that of "gross rent."  24 C.F.R. § 913.102 (1985).  The new rule further provided:

> Where all utilities (except telephone) and other essential housing services are supplied by the PHA, Tenant Rent equals Total Tenant Payment.  Where some or all utilities (except telephone) and other essential housing services are not supplied by the PHA and the cost thereof is not included in the amount paid as rent, Tenant Rent equals Total Tenant Payment less the Utility Allowance.

*Ibid.*

This definition held until 1996, when HUD revised the regulations so that "total tenant payment" explicitly mirrored the term "rent" in the Brooke Amendment, in much the same way that "rent" had explicitly meant "gross rent" rather than "contract rent" in earlier regulations.  24 C.F.R. § 5.613 (1997) ("Total tenant payment is the amount calculated under section 3(a)(1) of the 1937 [Housing] Act (42 U.S.C. § 1437a(a)(1)).").  The amendment thus formalized HUD's understanding of the Brooke Amendment's treatment of rent that underpinned *Wright*.  In 2000, HUD amended the regulation once again, replacing the express citation to the Brooke Amendment with language that, like the 1996 revision, very closely echoed the Amendment's limitation on rent.  *Compare* 24 C.F.R. § 5.628(a) *with* 42 U.S.C. § 1437a(a)(1).  In its

memorandum, HUD confirms that the 2000 amendment did not alter the previous, longstanding definition of rent for purposes of the Brooke Amendment.  Doc. 53 at 4, 6.

In short, since the adoption of the Brooke Amendment and its initial implementing regulations, HUD's regulatory regime has been consistent: the PHA cannot charge as rent an amount greater than 30 percent of adjusted monthly income minus a reasonable utility allowance—or, putting the same point differently, the PHA cannot charge rent in an amount that would result in rent plus a utility allowance (or utility payments to the PHA) exceeding 30 percent of the adjusted monthly income.  Doc. 53 at 2, 4.  As noted, CHA has forfeited, if not waived, any *Chevron* challenge to HUD's regulations.  And the foregoing discussion shows that the regime governing rent for purposes of the Brooke Amendment has not materially changed since *Wright* was decided—which means that § 1983 confers on Plaintiffs a private right of action under the Brooke Amendment to enforce the statutory rent ceiling and, in particular, to challenge CHA's determination of their utility allowances.

To survive a Rule 12(b)(6) motion, a complaint need only "contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Stapleton v. Advocate Health Care Network*, 817 F.3d 517, 521 (7th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Roberts v. City of Chicago*, 817 F.3d 561, 564-65 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678).  Accepting the operative complaint as true, and with *Wright* controlling, Haywood, Lewis, Stubenfield, and Lindsey have adequately pleaded with sufficient factual content that CHA charged them rent in excess of the Brooke Amendment's ceiling; for those four, the complaint alleges their adjusted monthly incomes and utility allowances, alleges that

CHA charges them rent equal to 30 percent of their monthly incomes minus the utility allowance, and further alleges that CHA assigned them a utility allowance lower than what it should have been. Doc. 18 at ¶¶ 17-35. That plainly states a claim, and CHA's motion to dismiss Count I is therefore denied as to them.

Plaintiffs acknowledge that McAllister's and Walton's Brooke Amendment claims are barred on limitations grounds, Doc. 38 at 32, so those claims are dismissed.

## II.     Regulatory Claims (Counts II and III)

Counts II and III allege that CHA violated the Brooke Amendment's implementing regulations by failing: (1) to review its utility allowances annually pursuant to 24 C.F.R. § 965.507(a); and (2) to provide interim adjustments of the utility allowances when utility rates increased by more than ten percent pursuant to 24 C.F.R. § 965.507(b). Doc. 18 at ¶¶ 84-89. The applicable regulation provides:

> (a) *Annual review.* The PHA shall review at least annually the basis on which utility allowances have been established and, if reasonably required in order to continue adherence to the standards stated in § 965.505, shall establish revised allowances. The review shall include all changes in circumstances (including completion of modernization and/or other energy conservation measures implemented by the PHA) indicating probability of a significant change in reasonable consumption requirements and changes in utility rates.

> (b) *Revision as a result of rate changes.* The PHA may revise its allowances for resident-purchased utilities between annual reviews if there is a rate change (including fuel adjustments) and shall be required to do so if such change, by itself or together with prior rate changes not adjusted for, results in a change of 10 percent or more from the rates on which such allowances were based. Adjustments to resident payments as a result of such changes shall be retroactive to the first day of the month following the month in which the last rate change taken into account in such revision became effective. Such rate changes shall not be subject to the 60 day notice requirement of § 965.502(c).

24 C.F.R. § 965.507(a)-(b). CHA contends that the regulations do not create a private right of action under § 1983. Doc. 30 at 19-21; Doc. 42 at 11-13; Doc. 54 at 4-5.

"[A] plaintiff cannot use § 1983 to enforce regulations in the abstract; enforcement depends on the role regulations play in making statutory obligations more concrete …." *Mungiovi v. Chi. Hous. Auth.*, 98 F.3d 982, 984 (7th Cir. 1996). "Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001); *see also Stoneridge Invest. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 164 (2008) ("[I]t is settled that there is an implied cause of action only if the underlying statute can be interpreted to disclose the intent to create one."). "To discern whether a statute creates legal rights, [the court] must determine 'whether or not Congress intended to confer individual rights upon a class of beneficiaries.'" *Johnson v. U.S. Office of Personnel Mgmt.*, 783 F.3d 655, 664 (7th Cir. 2015) (quoting *Gonzaga*, 536 U.S. at 285). "Generally, [the court] consider[s] three factors to determine if a statute creates an enforceable right: (1) whether Congress intended the provision to benefit the plaintiff, as evidenced by rights-creating language; (2) whether the right is not so vague and amorphous that its enforcement would strain judicial competence; and (3) whether the statute unambiguously imposes a binding obligation on the [entity], such that the provision is couched in mandatory, rather than precatory, terms." *Ibid*.

In addressing the HUD regulations at issue in *Wright*, the Supreme Court noted that the Brooke Amendment created "a mandatory limitation *focusing on the individual family and its income*." *Wright*, 479 U.S. at 430 (emphasis added). Reaffirming the point in *Wilder v. Virginia Hospital Association*, 496 U.S. 498 (1990), and *Gonzaga*, the Court emphasized that the benefit at issue in *Wright* focused on PHA tenants rather than the PHA itself. *See Gonzaga*, 536 U.S. at 280 ("In *Wright*, we allowed a § 1983 suit by tenants to recover past overcharges under a rent-ceiling provision of the Public Housing Act, on the ground that the provision unambiguously

conferred a mandatory benefit focusing on the individual family and its income.") (alteration, citation, and internal quotation marks omitted); *Wilder*, 496 U.S. at 511 (noting that *Wright* "reasoned that both the statute and the regulations were mandatory limitations focusing on the individual family and its income") (quoting *Wright*, 479 U.S. at 430) (alteration and internal quotation marks omitted). By contrast, although 24 C.F.R. § 965.507 refers to "resident payments," the regulation does not so much as mention residents individually, families, individuals, or tenants. Instead, the regulation deals exclusively with the PHA's internal bookkeeping procedures for calculating utility allowances; it does not "focus[] … on the individuals protected." *Alexander*, 532 U.S. at 289.

In addition, the regulation states that the "PHA shall review" and/or revise the utility allowances. 24 C.F.R. § 965.507(a). The regulation thus is "phrased as a directive to the … agency charged with" implementing the Brooke Amendment, "not as a conferral of the right to sue upon the beneficiaries of the" statute. *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1387 (2015); *see also Alexander*, 532 U.S. at 289 (holding that when a statute "is phrased as a directive to … agencies engaged in the distribution of public funds … there is far less reason to infer a private remedy in favor of individual persons.") (quoting *Univs. Research Ass'n, Inc. v. Coutu*, 450 U.S. 754, 772 (1981) (alterations omitted). The Supreme Court has a "held that such language reveals no congressional intent to create a private right of action." *Armstrong*, 135 S. Ct. at 1387 (internal quotation marks omitted).

Plaintiffs incorrectly contend that *Wright* compels a different result. Doc. 38 at 26-29. True, *Wright* does note that HUD interim regulations then in effect "specifically set out guidelines that the PHAs were to follow in establishing utility allowances, and … require notice to tenants and an opportunity to comment on proposed allowances." 479 U.S. at 431-32.

However, *Wright* did not find a private right of action to enforce the regulations; rather, the Court explained that the specificity of those regulations defeated RHA's argument that the Brooke Amendment's definition of rent—a definition in the *statute*—was too vague and amorphous to enforce under § 1983. *Wilder*'s discussion of *Wright* confirms the point: "*Because the regulations set out guidelines for the housing authorities to follow in determining the utility allowance, the [Brooke Amendment] right was 'sufficiently specific and definite to qualify as [an] enforceable righ[t].'"* *Wilder*, 496 U.S. at 511-12 (quoting *Wright*, 479 U.S. at 432) (emphasis added); *see also Suter v. Artist M*, 503 U.S. 347, 357 (1992) (explaining that the HUD regulations in *Wright* "further defined how" to measure "a reasonable amount for utilities") (alteration omitted); *Mungiovi*, 98 F.3d at 985 (noting that *Wright* held enforceable "the maximum-rent rules in 42 U.S.C. § 1437a"); *Harris v. James*, 127 F.3d 999, 1007-08 (11th Cir. 1997) (noting that *Wright* "seemed to locate the right in the statutory provision, turning to the regulation only to answer the respondent's argument that HUD's *definition* of the statutory concept of 'rent' was not authorized by the statute," and "conclud[ing] that the *Wright* majority did not hold that federal rights are created by … [the implementing] regulations 'alone'"); *Dorsey v. Hous. Auth. of Balt. City*, 984 F.2d 622, 630-31 (4th Cir. 1993) ("In *Wright*, the *Wilder* Court noted, the provision for a reasonable utility allotment in the Brooke Amendment was enforceable because the regulations set out detailed guidelines for the housing authorities to follow in determining it."). Given all this, *Wright* and its progeny make clear that HUD's implementing regulations *confirm* a private right of action to enforce the Brooke Amendment's rent ceiling, but do not support an *separate* right of action to enforce the regulations directly.

The Fifth Circuit reached a different result in *Johnson v. Housing Authority of Jefferson Parish*, *supra*, concluding that *Wright* held that all HUD regulations related to the utility

allowance confer an enforceable right and that the "requirement that public housing authorities review their allowances each year and revise them if there has been a change of 10 percent or more in the utility rate since the last revision, admits of no discretion at all and could easily be determined and enforced by a court." 442 F.3d at 364-65. This court respectfully takes a different view. As shown above, the statutory right conferred by the Brooke Amendment and found enforceable in *Wright* is the right of a family not to pay more than the statutory ceiling in rent, including the reasonable cost of utilities. That right is distinct from the bookkeeping procedures in 24 C.F.R. § 965.507. Put in a more concrete way, if CHA did not charge rent greater than 30 percent of Plaintiffs' adjusted monthly income minus a legally compliant utility allowance, CHA would have violated no statutorily conferred right regardless of whether, as required by the regulations, CHA annually reviewed the utility allowance or revised them when rates increased by more than ten percent. Holding that the regulations are enforceable via a private right of action would be "to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress," which the Supreme Court has strictly forbidden. *Alexander*, 532 U.S. at 291.

The motion to dismiss is thus granted as to Counts II and III. It is possible that CHA's practices with regard to the annual review and revision of utility allowances violates its ACC with HUD, but a plaintiff "disappointed by a housing authority's intransigence must complain to HUD, which may respond by reducing the housing authority's federal grant." *Mungiovi*, 98 F.3d at 985; *see also ibid.* ("The extra requirements imposed by HUD … must be enforced by HUD, if they are to be enforced at all.").

**IV. Breach of Contract (Count IV)**

Count IV alleges that CHA breached its residential lease agreements with Plaintiffs by charging rent above the Brooke Amendment's ceiling and by failing to establish a utility allowance sufficient "to pay for a reasonable use of utilities by an energy conservative household of modest circumstances consistent with the requirements of a safe, sanitary, and healthy living environment." Doc. 18 at ¶¶ 90-91; Doc. 38 at 29-30. The lease sets forth both obligations. Doc. 18-2 at 5-6, §§ 1(b), 9. "Under Illinois law, a breach of contract claim has four elements: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) a breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Hess v. Bresney*, 784 F.3d 1154, 1158-59 (7th Cir. 2015) (internal quotation marks omitted); *see also Hammarquist v. United Cont'l Holdings, Inc.*, 809 F.3d 946, 949 (7th Cir. 2016) ("To prevail on a breach-of-contract claim in Illinois … the plaintiffs must show that there was a contract between the parties, and that [the defendants] breached the contract by failing to adhere to its terms."). CHA sets forth four grounds for dismissing Count IV, all unpersuasive.

First, CHA contends that Plaintiffs have not adequately alleged breach of contract because the complaint admits that they pay no more than 30 percent of their monthly adjusted income to CHA. Doc. 30 at 25; Doc. 42 at 13-14. This argument rehashes the argument for dismissal for lack of standing, and it is no more successful here. Indeed, even putting aside the Brooke Amendment, the lease independently provides that the utility "allowance shall be enough to pay for a reasonable use of utilities by an energy conservative household of modest circumstances." Doc. 18-2 at 5. Plaintiffs' allegations that CHA has improperly depressed the utility allowances despite significant increases in utility rates thus states a breach of contract claim. This is all that is required to withstand a motion to dismiss. *See* Fed. R. Civ. P. 8(a) ("A

pleading that states a claim for relief must contain … a short and plain statement of the claim showing that the pleader is entitled to relief.").

Second, CHA contends that Plaintiffs "allege no facts to demonstrate that the utility allowances they receive are not 'reasonable'" because they have not pleaded the actual cost of their utilities. Doc. 30 at 26. As noted, to survive a Rule 12(b)(6) motion, a complaint need only "contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Stapleton*, 817 F.3d at 521 (quoting *Iqbal*, 556 U.S. at 678). "[A]ll this means is that the plaintiff must include enough details about the subject-matter of the case to present a story that holds together." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 526 (7th Cir. 2015) (internal quotation marks omitted). This Plaintiffs have done. The complaint alleges that electricity and natural gas rates have, on several instances since CHA last revised the utility allowances, increased by at least 10 percent month over month. Doc. 18 at ¶¶ 51-52. And Plaintiffs' brief adds that electricity rates in Chicago "have increased a total of 30% since 2007" and that "gas prices increased dramatically in 2008 and 2014." Doc. 38 at 10 n.1. Because Plaintiffs have pleaded "facts that suggest a right to relief that is beyond the speculative level," *Smith v. Dart*, 803 F.3d 304, 309 (7th Cir. 2015), they have met their burden on a Rule 12(b)(6) motion.

Third, CHA contends that Plaintiffs have not exhausted the contractual remedies set forth in the lease. Doc. 30 at 23-25; Doc. 42 at 13. The lease provides that "[d]isputes arising under this Lease shall be resolved pursuant to CHA's Grievance Procedure." Doc. 18-2 at 29 (emphasis omitted). But this provision conflicts with HUD regulations, which provide that the "PHA grievance procedure shall not be applicable to … class grievances." 24 C.F.R. § 966.51(b); *see also Wright*, 479 U.S. at 426 (noting that "[t]he [PHA grievance] procedures are

open to individual grievances but not to class actions," and citing 24 C.F.R. § 966.51(b) (1986)).

Because its ACC with HUD requires CHA to operate in compliance with applicable HUD

regulations, Doc. 18 at ¶¶ 66-67, and because those regulations specifically exempt class claims

(regardless of whether they arise under a lease) from the PHA grievance procedure, Plaintiffs in

this putative class action need not exhaust any contractual remedies they might have.

Finally, CHA argues that, at a minimum, subject matter jurisdiction does not lie over

McAllister's and Walton's state law contract claims because they, unlike their four co-plaintiffs,

have no viable federal claim. That argument fails. Section 1367(a) of Title 28 provides that

"district courts shall have supplemental jurisdiction over *all* other claims that are so related to

claims in the action within [the district courts'] original jurisdiction that they form part of the

same case or controversy under Article III of the United States Constitution," adding that "[s]uch

supplemental jurisdiction shall include claims that involve the joinder or intervention of

additional parties." 28 U.S.C. § 1367(a) (emphasis added). As the Seventh Circuit has

recognized, "§ 1367(a) permits the adjudication of a claim by a pendent party that neither arises

under federal law nor is supported by diversity of citizenship." *Stromberg Metal Works, Inc. v.

Press Mech., Inc.*, 77 F.3d 928, 931 (7th Cir. 1996). McAllister's and Walton's contract claims

are so related to their four co-plaintiffs' Brooke Amendment claims that supplemental

jurisdiction is appropriate. *See id*. at 930-32 (finding supplemental jurisdiction where one

plaintiff did not meet the amount-in-controversy requirement, but nonetheless had suffered injury

from the same conduct); *Shamenski v. Chapiesky*, 2003 WL 21799941, *2 n.1 (N.D. Ill. July 30,

2003) (exercising supplemental jurisdiction over a wife's state law intentional infliction of

emotional distress claim against a police officer, based on facts that also gave rise to her

husband's § 1983 claim against the same officer).

Accordingly, the contract claims survive dismissal.

## Conclusion

For the foregoing reasons, CHA's motion to dismiss is granted as to the claims that CHA violated HUD regulations by failing to conduct annual reviews of or to timely adjust its utility allowances (Counts II-III); granted as to McAllister's and Walton's Brooke Amendment claims (Count I); and denied as to the other four plaintiffs' Brooke Amendment claims and all six plaintiffs' state law contract claims (Counts I and IV). Counts II-III are dismissed, as are McAllister's and Walton's Brooke Amendment claims; those dismissals are with prejudice because the flaws in those claims cannot be cured by repleading. CHA has until October 19, 2016 to answer the surviving portions of the operative complaint.

September 28, 2016

_____
United States District Judge